**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**JIT SUN LOO, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**AH CHENG LOO, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**AH SOOI WONG, Defendant-Appellant.**

**Nos. 72–3077 to 72–3079.**

United States Court of Appeals,
Ninth Circuit.

April 27, 1973.

Jason F. Oliver (argued), Honolulu, Hawaii, for defendant-appellant, Ah Sooi Wong.

Thomas P. Young, Asst. U. S. Atty. (argued), Robert K. Fukuda, U. S. Atty., Honolulu, Hawaii, for plaintiff-appellee.

Before BROWNING and GOODWIN, Circuit Judges, and TAYLOR,* District Judge.

FRED M. TAYLOR, District Judge:

The appellants, Jit Sun Loo, Ah Cheng Loo and Ah Sooi Wong, and five other persons, were charged in an indictment with conspiracy to import approximately 17.5 pounds of heroin into the United States in violation of Title 21, United States Code, Sections 952 (a) and 963.

Three of the co-defendants, Chee Kong Lee, Heng Hang Loo and Hwa Eng Teh (hereinafter referred to as the Honolulu defendants) were tried together and convicted of the illegal importation of heroin into the United States in violation of Title 21, U.S.C. § 952(a). These defendants were not tried on the conspiracy charge. Co-defendants Kan Tsoi Tai and Kay Lim Young were tried together which resulted in a mistrial and the government dismissed the indictment as to them.

The appellants were tried separately and each convicted on the conspiracy charge. The appellants filed separate appeals which were consolidated for argument and disposition. In considering these appeals we shall do so in two Parts. The appeals of appellants Jit Sun Loo and Ah Sooi Wong will be designated as Part One and the appeal of Ah Cheng Loo as Part Two.

Dennis W. Potts (argued), Honolulu, Hawaii, for defendant-appellant, Jit Sun Loo.

Joseph A. Kinoshita (argued), Honolulu, Hawaii, for defendant-appellant, Ah Cheng Loo.

*Part I*

The Honolulu defendants, Chee Kong Lee, Heng Hang Loo and Hwa Eng Teh, of Malaysian descent and citizenship, were arrested on January 26, 1972, by United States Customs agents at the

* The Honorable Fred M. Taylor, Senior United States District Judge, District of Idaho, sitting by designation.

Honolulu International Airport for the importation of 17.5 pounds of heroin. Their airline tickets disclosed their destination to be San Francisco via Philippine Air Lines, Flight 100. Customs agents learned from the Honolulu defendants that they were to be met in San Francisco by a person or persons whose identity or identities were unknown to them.

This information was immediately reported by the agents in Honolulu to customs officials in San Francisco who placed the area where Flight 100 was scheduled to arrive under surveillance on the evening of January 26, 1972. During the unloading of passengers from Flight 100, customs agents observed two male persons of Asiatic extraction, later identified as appellants Jit Sun Loo and Ah Sooi Wong, at the arrival gate. They did not meet anyone departing from the plane. The customs officials observed that all passengers, some of whom were of Oriental extraction, were met by other persons. The appellants were then observed going down to the baggage claim area for Flight 100 and waiting until all baggage from that flight had been claimed. Appellants then left the airport and proceeded to the Hilton Airport Inn located a short distance from the airport. Upon checking at the registration desk, the customs agents learned that the appellants had arrived at the Hilton Inn on the 24th of January, 1972 and planned to depart on January 26, 1972, the day on which, according to the information forwarded from customs officials in Honolulu, the Honolulu defendants were to arrive at San Francisco. The customs agents also learned from the hotel registration card the names of the appellants and that their place of residence was Malaysia.

A special surveillance was conducted by agents of the San Francisco Customs Office of the appellants at this time and they were under constant surveillance by customs agents on the evening of January 26, 1972, and during the day and early evening hours of January 27th. They were observed eating breakfast at the hotel and proceeding to the San Francisco International Airport in the morning and again in the early evening of January 27th, watching the incoming flights at the overseas area. They did not meet anyone departing from any flight at the airport while under surveillance.

While the above mentioned surveillance was being conducted in San Francisco, the three Honolulu defendants were placed on Philippine Airlines Flight 100 at Honolulu, accompanied by customs agents, and they arrived at the San Francisco International Airport on the evening of January 27th. On debarking from the plane the Honolulu defendants went to the baggage area for Flight 100 and seated themselves on a couch in the area.

During the time when the Honolulu defendants arrived at the airport, the appellants were observed watching everyone who debarked from Flight 100 and after all passengers deplaned, they proceeded to the baggage area where they were observed standing by the National Car Rental counter, approximately 60 feet from where the Honolulu defendants were seated. Appellants remained in the area of the National Car Rental counter until all passengers from Flight 100 had picked up their luggage and departed. During this time, appellant Ah Sooi Wong was observed walking to within three to five feet of where the Honolulu defendants were seated and then turning around and returning to the area of the car rental counter. By the time appellants left the baggage area, the only people remaining were the Honolulu defendants, the customs agents and themselves. The appellants then left the airport and returned to their room at the Hilton Inn where they were arrested by customs agents without an arrest warrant. During the entire sequence of events at the baggage area, no words, gestures or other forms of communication were observed by the customs agents between appellants and the Honolulu defendants.

Immediately following the arrest of the appellants, they were handcuffed and seated on a bed. On entering the room the agents commenced a search thereof and no weapons, contraband or illegal substances of any nature were found. A briefcase, located at the foot of the bed on which appellants were seated, was searched and plane tickets, passports and identification cards were seized and later introduced over the objections of appellants at trial.

These appellants have presented several issues for consideration of this court, each of which they contend require the reversal of their convictions. We believe the most crucial questions presented are whether the warrantless arrest of the appellants in their room at the Hilton Inn was lawful under the circumstances hereinabove related, and whether the search and seizure conducted by the agents, incident to said arrest, was unreasonable and unlawful.

 Title 26 U.S.C. § 7607, as amended, provides that officers of the customs may make arrests without a warrant for violation of any law of the United States relating to narcotic drugs where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation. In Draper v. United States, 358 U.S. 307, 310, 79 S. Ct. 329, 3 L.Ed.2d 327 (1959), the Supreme Court stated that "reasonable grounds" as used in the aforesaid statute, and "probable cause" as used in the Fourth Amendment, are substantial equivalents of the same meaning. In United States v. McDowell, 475 F.2d 1037 (9th Cir. 1973), this court reiterated the standard necessary to authorize a valid arrest without a warrant:

"Whether a warrantless arrest, made by a state or federal officer, is constitutionally valid depends upon whether, at the moment of arrest, the officers had probable cause to make it. *Arresting officers have probable cause*

*if, at the moment of arrest, 'the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the . . . (arrested person) . . . had committed or was committing an offense.'* [citation omitted] *In applying that test, the facts as they appeared to the arresting officer must be judged against an objective standard, the subjective good faith of the officer is not dispositive."* [emphasis added]

See also Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925); U. S. v. Tramontana, 460 F.2d 464, 467 (2nd Cir. 1972), and United States v. Rivera, 321 F.2d 704, 708 (2nd Cir. 1963).

United States v. Rivera, supra, at 707 states:

"The test of probable cause is designed to strike a reasonable and proper balance between the protection of the rights of the individual citizen against 'unreasonable interferences with privacy and from unfounded charges of crime,' on the one hand, and the countervailing reasonable necessities of law enforcement for the protection of the community at large on the other. [citation omitted] The test is plainly a practical compromise and the probabilities with which it deals must be viewed in the light of 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' [citation omitted] 'The quantum of information which constitutes probable cause * * * must be measured by the facts of the particular case.' "

 Applying the above stated standards to the facts of this case, this court cannot find that the customs officers had "reasonable grounds" or "probable cause" to make the arrest of appellants Jit Sun Loo and Ah Sooi Wong in their

room at the Hilton Inn on the evening of January 27, 1972. The circumstances of this case could raise a suspicion in the minds of the customs agents that appellants had or were about to have some connection with the Honolulu defendants, but it is axiomatic that mere suspicion will not justify an arrest without a warrant. It is doubtful that the information which the agents had, in regard to these appellants, would have been sufficient to justify the issuance of a warrant for their arrest. The only information the agents had was that the Honolulu defendants were going to be met in San Francisco. They did not have a description of the person or persons, they did not know the name or names, and they did not know why such person or persons might be meeting the Honolulu defendants. Because of the activities of these appellants, the most that the agents had was a suspicion that they were in some way connected with the importation of heroin.

In conclusion, this court is of the opinion that the following language from Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed. 2d 441 (1963) appropriately sums up our position:

> "It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion. . . . The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause could 'leave law-abiding citizens at the mercy of the officers' whim or caprice.'"

It follows that since the agents did not have "reasonable grounds" or "probable grounds" to make the warrantless arrest of these appellants, the search for and seizure of evidence incident to said arrest was unreasonable and unlawful. The admission at trial of the evidence thus obtained was erroneous.

Since we are constrained to conclude that the evidence, obtained as a result of the unlawful arrest and the search and seizure incident thereto was inadmissible, the conviction of each of appellants must be reversed and it is unnecessary for us to consider the remaining issues presented on their appeals.

## Part II

Appellant Ah Cheng Loo has raised several issues on his appeal, the most critical being whether he was entitled to a judgment of acquittal on the charge of conspiracy at the close of the government's case. The basic facts on which he was convicted are as follows:

Customs agents first focused on Ah Cheng Loo through a telephone call placed from the room of appellants Jit Sun Loo and Ah Sooi Wong at the Hilton Inn to Room 1018 of the Prince George Hotel in New York, which room was registered to Ah Cheng Loo. At this time Ah Cheng Loo was placed under surveillance by customs agents.

Following his arrest in San Francisco, Jit Sun Loo agreed to permit customs agents to monitor two telephone calls which he placed to Room 1018, Prince George Hotel. The actual monitoring was accomplished by attaching a tape recorder to the telephone used by Jit Sun Loo. A government interpreter also listened in on the conversation and later translated the tape into English since parts of the conversations were conducted in the Malaysian language.[1]

---

1. Transcription of Tape of Telephone Conversation
Placed from the Hilton Inn
San Francisco International Airport,
January 27, 1972,
Interpreted by Joseph Ng
"Operator: This is the operator.
Chen: [customs agent] Yeah. This is Room 322. The name is Handy. May I have Area Code 212. The number is 532–7800.
Operator: And you're Mr. Handy?
Chen: Right.
Operator: H-a-n-d-y?
Chen: Umm hmm.
Operator: OK. Thank you.
Operator: Prince George.
J. Loo: [Jit Sun Loo] Hello?

At the time each of the telephone calls was placed to Room 1018 at the Prince George Hotel, customs agents, located in a room across from 1018, knew Ah Cheng Loo was the only occupant in that room and they were able to hear the telephone ring and a man's voice answer.

Ah Cheng Loo was next observed leaving Room 1018 at approximately 1:30 PM on January 28, 1972 and taking a subway to 77th Street and Lexington Avenue where he had a cup of coffee. He then proceeded by taxi to the Queens, New York area where he entered an apartment house, stayed approximately 10 minutes and then traveled by train to Grand Central Station where contact with him was lost by customs agents at approximately 3:00 PM. Ah Cheng Loo was next seen at approximately 5:00 PM on the same day at the John F. Kennedy International Airport where he was observed meeting Hwa Eng Teh (one of the Honolulu defendants) and appellant Ah Sooi Wong, both of whom had just arrived on a flight from San Francisco accompanied by customs agents. The record reveals that the three Malaysians shook hands and spoke briefly, although none of the conversation was overheard. Ah Cheng Loo then left the airport in what is described as a "hurried fashion" and was arrested while attempting to get into a taxi.

▆ In considering this evidence, this court is bound by the well established rule that once a verdict of guilty has been rendered by a jury, an appellate court must view the evidence in the light most favorable to the government. See United States v. Eskridge, 456 F.2d 1202, 1205 (9th Cir. 1972). We are also compelled on review to apply the follow-

Operator: Yes?
J. Loo: Is this the Prince George?
Operator: That's right.
J. Loo: Please give me Room 1018 please.
Operator: 1018?
J. Loo: Yes.
Operator: Thank you.
A. Loo: [Ah Cheng Loo] (response inaudible)
J. Loo: Hello?
A. Loo: Is Tin there?
J. Loo: He has gone.
A. Loo: Tomorrow what time do they come?
J. Loo: They have bought the ticket.
A. Loo: Don't make it too clear.
J. Loo: I will phone you again tomorrow. Tomorrow I will tell you what time the plane will leave here and also the flight number.
A. Loo: Don't make it too clear.
J. Loo: Nothing else to say. That's all."

Transcription of Tape of Telephone Conversation
Placed from the Hilton Inn,
San Francisco International Airport,
January 28, 1972,
Interpreted by Joseph Ng

"J. Loo: Hello?
Cameron: This is Mr. Cameron at the front desk. Is Mr. Handy there?
J. Loo: Hold on a minute.
Handy: Yes, Mr. Cameron.
Operator: Your name and room number?

Handy: OK. Just a second . . . (part of conversation inaudible). Are you going to do the registration under his name? (part of conversation inaudible) Well, if he calls back. OK, you do it. Hang on a second.
Operator: OK.
J. Loo: Hello?
Operator: Hello. Yes, I need the registered last name and the room number.
J. Loo: You mean my room number? Uh, Mr. Loo, L double O, Room 323.
Operator: How do you spell your last name?
J. Loo: L. double O.
Operator: Thank you.
J. Loo: This is the right number, isn't it?
Operator: Good afternoon.
J. Loo: Prince George?
Operator: Yes.
J. Loo: Please give me Room 1018 please.
Operator: Thank you. Excuse me, that's 1018?
J. Loo: 1018.
Operator: 1018. Thank you.
A. Loo: Hello?
J. Loo: Cheng? They all have gone there. They left after 9.
A. Loo: What is the number?
J. Loo: 800. They will arrive there after 5.
A. Loo: When everything's all right, I will phone you again tonight.
J. Loo: OK.
A. Loo: Goodbye."

ing standard articulated by the Supreme Court in American Tobacco Co. v. United States, 328 U.S. 781, 787 N. 4, 66 S. Ct. 1125, 1128, 90 L.Ed. 1575 (1946):

"The verdict in a criminal case is sustained only when there is 'relevant evidence from which the jury could properly find or infer, *beyond a reasonable doubt,*' that the accused is guilty." [emphasis added]

See also United States v. Nelson, 419 F. 2d 1237, 1242 (9th Cir. 1969).

■ The burden which the government has in a conspiracy case is well stated in United States v. De Cavalcante, 440 F.2d 1264, 1272 (3rd Cir. 1971):

"Under the teaching of Glasser v. United States . . . the prosecution must establish by substantial evidence, restricted to proof *aliunde,* the fact that a conspiracy existed. *'Once the existence of a conspiracy is clearly established,* slight evidence may be sufficient to connect a defendant with it.'" [emphasis added]

The essential elements necessary to establish a conspiracy are: (1) an agreement by two or more persons to combine for an illegal purpose, and (2) an overt act by one member in furtherance of the agreement. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). Further, there must be present *at least* the same degree of criminal intent necessary for the substantive offense itself, i. e. importation of heroin into the United States. See Jefferson v. United States, 340 F.2d 193 (9th Cir. 1965).

■ In assessing the evidence presented in this case, we find the record void of "substantial evidence" that Ah Cheng Loo conspired with anyone to import heroin into the United States. At trial, evidence was intro-

duced showing the importation of approximately 17.5 pounds of heroin by the Honolulu defendants and the activities of the San Francisco appellants, as described in Part I of this opinion. The two telephone calls from Jit Sun Loo to Ah Cheng Loo and the meeting at the Kennedy Airport only indicate at most a suspicion that Ah Cheng Loo was implicated in the enterprise, which is essentially devoid of any substantial foundation in fact to establish the elements necessary to show the existence of a conspiracy. The record does not reveal any other competent evidence upon which the government may rely to establish that Ah Cheng Loo was a party to the alleged conspiracy.

In United States v. Borelli, 336 F.2d 376, 384 (2nd Cir. 1964), Judge Friendly has stated the applicable principle as follows:

"Although it is usual and often necessary in conspiracy cases for the agreement to be proved by inference from acts, the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant."

The gravamen of a conspiracy charge being the agreement, this court cannot find that the evidence which the government had in this case is the kind of circumstantial evidence which can supply the requisite foundation for a conspiracy conviction. See United States v. Gardner & Le Boulanger, 475 F.2d 1273 (9th Cir. 1973).

Accordingly, the conviction of Ah Cheng Loo is reversed. Having reversed on this issue, it is not necessary to decide the remaining issues presented on the appeal.

The judgment of conviction in each of the above entitled cases is reversed.