**UNITED STATES of America,
Appellant,**

v.

**Christopher PATRICK,
Defendant–Appellee,**

**Linda Taylor and Christopher
Patrick, Defendants.**

**No. 507, Docket 89–1356.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 8, 1990.

Decided March 27, 1990.

Michael A. Battle, Asst. U.S. Atty., W.D. N.Y., Buffalo, N.Y. (Dennis C. Vacco, U.S. Atty., W.D.N.Y., Buffalo, N.Y., of counsel), for appellant.

Carl H. Dobozin, Buffalo, N.Y., for defendant-appellee.

Before MESKILL and NEWMAN, Circuit Judges, and WEINSTEIN,* District Judge.

MESKILL, Circuit Judge:

We are presented with the question whether the United States District Court for the Western District of New York, Arcara, J., properly suppressed defendant-appellee Christopher Patrick's inculpatory statements made to law enforcement officials while he was detained after crossing the border from Canada into the United States and after cocaine was discovered in the possession of another person who entered the United States at the same time as Patrick. The government appeals the district court's suppression order pursuant to 18 U.S.C. § 3731. Because the law enforcement officials had probable cause to detain and arrest Patrick, we reverse and remand.

## BACKGROUND

The relevant facts, as found by the district court or conceded by Patrick, are as follows. On October 13, 1988, Patrick and co-defendant Linda Taylor entered the U.S. Immigration Office at Niagara Falls, New York after crossing the international border on foot from Canada to the United States at Whirlpool Bridge. Taylor, who was carrying a purse and a knapsack, was followed by Patrick, who also carried a knapsack. They were the only civilian pedestrians in the Immigration Office at the time.

The two approached a counter at which U.S. Customs Inspector Timothy Jasen was working. Inspector Jasen questioned the two about their citizenship and length of stay in Canada. He learned that Taylor was a United States citizen and that Patrick was a resident alien from Jamaica. Both told Inspector Jasen that they had accidentally crossed the border from the United States to Canada on a bus and that, upon realizing the mistake, had gotten off the bus and walked back to the United

States over the Whirlpool Bridge. Finding their story somewhat suspicious, Inspector Jasen directed them to a secondary inspection point.

At the secondary inspection point, Inspector Jasen conducted a search of Patrick's baggage. Meanwhile, U.S. Customs Inspector April Zolczer searched Taylor's purse and knapsack. From the torn lining of Taylor's purse, Inspector Zolczer found two plastic bags wrapped in packing tape containing a powdery substance that later tests revealed to have a cocaine base. A similar third package was retrieved a short time thereafter. Upon the discovery of the packages, Inspector Zolczer searched Taylor's person and placed her in a holding cell. Inspector Jasen also detained Patrick by handcuffing him to a chair in a separate room.

At approximately 12:00 noon, U.S. Customs Special Agents Peter Smith and John Nickerson arrived at the Immigration Office to interrogate Taylor and Patrick. After first interviewing Taylor, Special Agents Smith and Nickerson took Patrick to an interview room, advised him of his constitutional rights, and questioned him. At approximately 2:00 p.m., Drug Enforcement Administration (DEA) Special Agent Jesse Meekins arrived and also questioned Taylor and Patrick separately after advising them of their rights again. In response to the questioning by the Special Agents, Patrick made an oral and written statement that a person named "Gino" asked him to accompany Taylor to make sure that the packages were delivered to Niagara Falls.

Taylor and Patrick were indicted on one count of unlawful importation of a controlled substance in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2 and one count of unlawful possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Both defendants made motions to suppress certain evidence, including any inculpatory statements made after they were detained. The district court denied Taylor's motion,

---

* Hon. Jack B. Weinstein, United States District Judge for the Eastern District of New York, sitting by designation.

but granted Patrick's motion to suppress his statements made subsequent to his detention. The government appeals the suppression order.

## DISCUSSION

■ Our review of the district court's factual findings, of course, is limited by the settled rule that findings of historical fact "may not be disturbed unless the findings are clearly erroneous." *United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984). The ultimate determination of whether probable cause to arrest existed on the basis of those findings, however, is essentially a legal question subject to *de novo* review. *United States v. Greene*, 783 F.2d 1364, 1367 (9th Cir.), *cert. denied*, 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986); *see also United States v. Simmons*, 786 F.2d 479, 483 (2d Cir.1986).

■ The district court determined that the Customs officials lacked probable cause to arrest Patrick and therefore violated his Fourth Amendment right to be free of unreasonable searches and seizures. Accordingly, the court concluded that Patrick's statements should be suppressed as the product of an unlawful arrest. *See Dunaway v. New York*, 442 U.S. 200, 216–19, 99 S.Ct. 2248, 2258–60, 60 L.Ed.2d 824 (1979). In doing so, the court likened Patrick to the defendant in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), suggesting that the only link between Patrick and the cocaine discovered in Taylor's purse was Patrick's proximity to Taylor when they crossed the border from Canada.

In *Ybarra*, police received information from a confidential informant that the bartender at a certain tavern was in possession of numerous packets of heroin. On the basis of this information, they obtained a warrant authorizing a search of the bartender and the tavern. *Id.* at 87–88, 100 S.Ct. at 340–41. Upon entering the premises of the tavern, the police conducted a "frisk" search of the patrons in the tavern, one of whom was Ybarra. When Ybarra was frisked, the police officer conducting the search discovered a cigarette pack containing six tinfoil packets of heroin. Ybar-

ra was subsequently indicted and found guilty of unlawful possession of a controlled substance. *Id.* at 88–89, 100 S.Ct. at 340–41.

The Supreme Court held that the police lacked probable cause to search Ybarra and to seize the heroin found on him. The Court stressed that the only thing the police knew about Ybarra upon entering the tavern and up to the point when he was searched was that he was present in the tavern, along with others, at a time when the police had a reasonable basis to believe that the bartender had heroin to sell. *Id.* at 90–91, 100 S.Ct. at 341–42. This alone was insufficient to constitute probable cause. As the Court stated, "a person's mere propinquity to others independently suspected of criminal activity does not, *without more*, give rise to probable cause to search that person." *Id.* at 91, 100 S.Ct. at 342 (emphasis added).

The instant case is readily distinguishable from *Ybarra*, for the Customs officials knew something more about Patrick than just his "propinquity" to Taylor. The facts, as found by the district court, reveal that Patrick and Taylor were not merely waiting in line next to each other, along with numerous others, to enter the United States. Rather, they entered the office together, both with knapsacks, at a time when no other civilian pedestrians were about. Most significantly indicating that they were traveling together, they both told Inspector Jasen the unusual story of accidentally crossing the border into Canada on a bus and walking back over the Whirlpool Bridge to the United States.

■ Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested. *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *see Illinois v. Gates*, 462 U.S. 213, 230–32, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Ybarra*, 444 U.S. at 91, 100 S.Ct. at 342.

Once the Customs officials discovered the cocaine in Taylor's purse, the information they had about Patrick—that he entered the Immigration Office with Taylor at a time when no others were present and that they both had accidentally crossed into Canada—provided an adequate basis for the officials to reasonably believe that Patrick was not just a mere innocent traveling companion but was traveling *and* acting in concert with Taylor in transporting the cocaine. Therefore, the Customs officials had probable cause to arrest Patrick, and the district court erred in ordering the suppression of the statements he made to the law enforcement officials after his arrest.[1]

## CONCLUSION

The Customs officials had probable cause to detain and arrest Patrick. Because the arrest was lawful, the district court erred in granting Patrick's motion to suppress his inculpatory statements made after his detention. The order of the district court is accordingly reversed, and the matter is remanded to the district court for further proceedings consistent with this opinion.

WEINSTEIN, District Judge, dissenting:

The salient facts demonstrate that appellee Christopher Patrick was arrested without probable cause. The district court properly granted an order of suppression.

Were we not involved in a war on drugs (with the usual threat to civil liberties posed by any such serious national conflict) and had defendant been a citizen of the middle class (instead of a member of three minority classes by virtue of socioeconomic status, color and alienage), the good people who guard our borders would not have so encroached on his freedom, and this case would never have arisen. The lesson must be relearned in every generation—allow the rights of the least powerful to wither and the corrosion of injustice leaches out justice in the rest of society. *Cf., e.g.,* Zamir, *Human Rights and National Security,* 23 Is.L.Rev. 375, 382 & n. 11 (1989) (describing Address by Justice William J. Brennan, "The Quest to Develop a Jurisprudence of Civil Liberties in Times of Security Crisis" (Dec. 22, 1987) (United States)); M. Frankel with E. Saideman, *Out of the Shadows of the Night: The Struggle for International Human Rights,* 5–9 (1989) (Argentina and Soviet Union).

No persuasive precedent before now has authorized the arrest of a person because he was suspected of traveling with a drug carrier. Americans' easy openness in treating those they meet on bus, train and plane, turning strangers into companions and friends, should not be inhibited by law such as is adopted in this case. Now, before striking up an acquaintance with a fellow passenger, we would be well advised to insist on a frisk and baggage check.

## I. FACTS

On October 13, 1988, Linda Taylor and Christopher Patrick walked over the Whirlpool Bridge, entering the United States Immigration Office in Niagara Falls, New York, one behind the other, in a proximity not fixed by the record. Both are black. Each carried a backpack. Taylor had a purse.

Upon separate questioning by the United States Customs Agent, each told a similar story. Each had boarded a bus in New York City intending to travel to Niagara Falls, New York. When each inadvertently arrived in Canada, each walked the short distance back across the bridge into the United States.

At no time were Patrick and Taylor observed conversing. There is no evidence in the record that either acknowledged the other's presence in any manner. Neither indicated that they were traveling together.

---

1. Having concluded that probable cause existed to arrest Patrick, we need not address the government's argument that a lower standard would justify Patrick's detention because the detention took place upon his crossing an international border where the government has broader authority to conduct searches than it does elsewhere. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 537–38, 105 S.Ct. 3304, 3308–09, 87 L.Ed.2d 381 (1985); *United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977).

Each was peaceable and offered no resistance.

The agent sent Patrick, along with Taylor, to a secondary inspection point to make baggage declarations. They were then individually searched, each by a separate agent.

Crack was found in the lining of Taylor's purse. She was then properly placed in the only holding cell.

Patrick answered all the agents' questions. He supplied proper identification and an alien registration card showing he was a Jamaican national. No illegal substances were found on him or in his pack. Nevertheless, he was handcuffed to a chair. He was so confined for the next four hours.

Approximately two hours after being handcuffed, upon being interrogated by two additional government agents, Patrick agreed to cooperate. Only after a total of four hours of immobility, repeated interviews by at least four government officials and promises of exculpation in exchange for cooperation, did Patrick make self-incriminating statements. He admitted that he was traveling with Taylor in order to make sure she delivered the drugs.

The majority properly cites *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1963), for the proposition that probable cause to arrest exists if the facts within the knowledge of the arresting officials reasonably lead them to believe that a crime has been committed by the person to be arrested. What is at issue is the criteria the police may use in making judgments. "It is the intersection of expertise with common prejudices that produces a greater likelihood of error." Johnson, *Race and the Decision to Detain a Suspect*, 93 Yale L.J. 214, 256 (1983). *See generally Developments in the Law–Race and the Criminal Process*, 101 Harv.L.Rev. 1472, 1494–97 (1988).

"Precisely because the need for action against the drug scourge is manifest, the need for vigilance against unconstitutional excess is great." *Skinner v. Railway Labor Executives Ass'n*, —— U.S. ——, 109 S.Ct. 1402, 1422, 103 L.Ed.2d 639 (1989) (Marshall, J., dissenting). *See also United States v. Salas*, 879 F.2d 530, 541 (9th Cir.) (Ferguson, J., concurring in part and dissenting in part) ("However laudable the underlying goal of eradicating drugs from our society, we must ensure that we do not also eradicate the Fourth Amendment in the process...."), *cert. denied*, —— U.S. ——, 110 S.Ct. 507, 107 L.Ed.2d 509 (1989); *United States v. Gallagher*, 714 F.Supp. 811, 816 (N.D.Tex.1989) (drug dealers loathsome, but they, like all others, are entitled to Fourth Amendment protections). The arrest of Christopher Patrick is an example of drug war zealousness infringing on constitutional rights.

## II.  DISTRICT COURT HEARING

The standard governing appellate review is codified in Federal Rule of Civil Procedure 52(a): " 'Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.' " *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). *Accord Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). A factual conclusion is deemed clearly erroneous only when the reviewing court possesses the "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). *Accord United States v. $10,000 in United States Currency*, 780 F.2d 213, 220 (2d Cir.1986).

Deference is required not only because the trial judge is in the best position to determine witness credibility, but also because fact finding is the particular realm of a trial judge's expertise. "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (citation omitted). It is not enough for an appellate court to reverse " 'the trier of

fact simply because it is convinced it would have decided the case differently.' " *United States v. $10,000 in United States Currency*, 780 F.2d 213, 220 (2d Cir.1986) (quoting *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511).

In the case at bar, Judge Arcara was in the best position to critically view the witnesses, to ascertain the nuances in their attitudes, and, as the district judge assigned to this geographic area, to evaluate and comprehend the physical setting and other factors involved in the operation of this particular local customs station. There was no determination by the trial court that there was sufficient evidence that Patrick and Taylor were traveling together when they reached the Immigration Office. The trial court's decision to suppress suggests a contrary conclusion.

## III. THE ARREST

To promote effective crime prevention and detection, an officer may, under appropriate circumstances and in a suitable manner, investigate a person for criminal behavior even though there would be no probable cause for making an arrest. *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880–81, 20 L.Ed.2d 889 (1968). In *Terry* a police officer observed three men who repeatedly walked up and down a particular street and continually paused to look in the same store window. The officer approached the individuals believing they were preparing for a robbery; he frisked them. This action was deemed by the Court to be an investigatory stop, not an arrest. Similarly, a border stop permits a full search without arrest. *United States v. Ramsey*, 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977).

"An arrest is a wholly different kind of intrusion upon individual freedom.... An arrest is the initial state of a criminal prosecution.... [I]t is inevitably accompanied by future interference with the individual's freedom of movement...." *Terry v. Ohio*, 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968). When a police officer "accosts an individual and restrains his freedom to walk away," as by handcuffing,

that individual has been seized and arrested within the meaning of the Fourth Amendment. *Id.* at 16, 88 S.Ct. at 1877. *See also, e.g., United States v. Moreno*, 897 F.2d 26, 32 (2d Cir.1990) (suspect deemed arrested when officer pushed him against wall and told him not to move); *United States v. Barnes*, 443 F.Supp. 137, 144 (S.D.N.Y.1977) (defendant was arrested when he was handcuffed), *aff'd*, 604 F.2d 121 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

There can be no doubt that Patrick was arrested when he was handcuffed to a chair. This was not a mere stop.

## IV. PROBABLE CAUSE

To justify an arrest, even at the border, probable cause to believe the suspect has committed a crime is required. *See Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 1324–25, 75 L.Ed.2d 229 (1983). That probable cause must be present at the moment of arrest. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964). An arrest is not valid if it is executed to afford the agents an opportunity to amass facts sufficient to constitute probable cause. *United States v. Martinez*, 465 F.2d 79, 82 (2d Cir.1972) (citations omitted).

While "good hunches are the foundation of good police work," they do not provide sufficient grounds to arrest. *United States v. Chadwick*, 532 F.2d 773, 785 (1st Cir.1976), *aff'd on other grounds*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). The courts have discouraged "intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches...." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880–81, 20 L.Ed.2d 889 (1968). Even assuming, *arguendo*, that, as in *Chadwick*, the circumstances of the case at bar may have led the agents to suspect wrongdoing, that suspicion alone does not amount to probable cause.

Neither does association by physical proximity to a criminal constitute probable cause to arrest. *Siron v. New York*, 392

U.S. 40, 62–64, 88 S.Ct. 1889, 1902–03, 20 L.Ed.2d 917 (1968). *See also Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (propinquity to others independently suspected of criminal activity insufficient to provide probable cause for search or arrest); *United States v. Jit Sun Loo*, 478 F.2d 401, 403 (9th Cir.1973) (mere physical proximity to others previously arrested for drug importation is not sufficient probable cause to justify arrest). *Cf. United States v. Welker*, 689 F.2d 167, 169 (10th Cir.1982) (mere suspicion of criminal activity, based in part on suspect's race, does not constitute probable cause for arrest). In *United States v. Jit Sun Loo*, 478 F.2d 401 (9th Cir.1973), customs agents learned that heroin traffickers aboard a Philippine Airlines flight leaving Honolulu were being met upon their arrival at the airport in San Francisco. The agents spotted two Asian males at the arrival gate acting suspiciously as if they were waiting for the arrival of the known drug dealers, placed them under surveillance, and later arrested them. In holding there was no probable cause for their arrest, the court declared:

> [t]he circumstances of this case could raise a suspicion in the minds of the customs agents that appellants had or were about to have some connection with the Honolulu defendants, but it is axiomatic that mere suspicion will not justify an arrest. . . .

*Id.* at 405.

The Supreme Court in *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), a companion case to *Terry*, found no probable cause to arrest where a defendant was seen speaking to six or more known narcotics addicts and later observed in a restaurant with three more addicts. In *United States v. Hansen*, 652 F.2d 1374, 1390 (10th Cir.1981), the Court of Appeals noted that the fact that defendant was traveling with two suspected cocaine dealers may understandably have led police to suspect that he was also involved in the illegal activity, but it did not establish probable cause for his arrest. The court declared that "association with known or suspected criminals is not enough

in itself to establish probable cause" and suppressed evidence discovered as a result of the unlawful arrest. *Id.* at 1388.

District Court Judge Arcara was correctly persuaded to grant Patrick's motion to suppress by the Supreme Court decision in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). In that case the Court ruled that

> a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

*Id.* at 91, 100 S.Ct. at 342 (citations omitted).

Companionship with one known to be in possession of narcotics is insufficient to establish probable cause. *See United States v. Moreno*, 897 F.2d 26, 31 (2d Cir. 1990) (" 'more than physical companionship and/or a working relationship is required' to establish probable cause with respect to a companion" of a narcotics possessor) (quoting *United States v. Afanador*, 567 F.2d 1325, 1331 (5th Cir.1978)); *United States v. Everroad*, 704 F.2d 403, 406 (8th Cir.1983) (no probable cause to arrest and evidence suppressed where defendant drove in a car containing marijuana with drug dealer to where deal was arranged); *United States v. Chadwick*, 532 F.2d 773, 784 (1st Cir.1976) (no probable cause to arrest and evidence suppressed where defendant assisted one in control of footlocker containing marijuana by loading footlocker into defendant's car), *aff'd on other grounds*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Linnear*, 464 F.2d 355, 356 (9th Cir.1972) (no probable cause to arrest and evidence suppressed where defendant was in a car with a man seen making a cocaine transaction

and with a woman in whose purse a "gelatin capsule" was discovered); *People v. Ballejo*, 114 A.D.2d 902, 495 N.Y.S.2d 75, 77–78 (2d Dep't 1985) (fact that defendant accompanied woman at the time she was seen concealing cocaine did not permit inference that defendant was engaged in criminal activity).

In the case at bar, the agents used physical proximity and companionship as a measure of culpability—a practice long interdicted by federal case law. Even if the customs agents had established conclusively that Patrick and Taylor were travelling together, this additional fact would have been insufficient cause to arrest Patrick.

## V. SUPPRESSION OF STATEMENT

Statements made as the result of a coercive illegal arrest must be suppressed because such evidence " 'has been come at by exploitation of that illegality.' " *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963) (citation omitted). *Accord Dunaway v. New York*, 442 U.S. 200, 217–18, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979); *United States v. Morales*, 788 F.2d 883, 885 (2d Cir.1986). Evidence obtained during illegal detention is inadmissible unless it did not derive directly from the seizure but rather from " 'an intervening independent act of free will.' " *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–17. *See also Morales*, 788 F.2d at 885–86.

In *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the Supreme Court suppressed statements made when the defendant had been held in custody in a police station and questioned on less than probable cause. The court held that the police violated the Fourth and Fourteenth Amendments, *id*, at 216, 99 S.Ct. at 2258–59, and that any incriminating evidence obtained during the illegal detention was not admissible at trial. *Id.* at 219, 99 S.Ct. at 2260.

*Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), involved a defendant who had been illegally arrested and confessed some hours later. There, as in the case at bar, the temporal proximity of the arrest and confession were persuasive that the statements were tainted by the arrest. *Id.* at 604–05, 95 S.Ct. at 2262–63. *Accord Taylor v. Alabama*, 457 U.S. 687, 691, 102 S.Ct. 2664, 2667–68, 73 L.Ed.2d 314 (1982) (confession inadmissible as fruit of illegal arrest when time and intervening events between arrest and confession were insufficient to purge taint). *See generally* Finnegan, *Scope of the Fourth Amendment*, 74 Geo.L.J. 499, 614–16 (1986). Nor do Miranda warnings amount to an intervening act eliminating the coercive effect of the illegal arrest. *Dunaway v. New York*, 442 U.S. 200, 216–17, 99 S.Ct. 2248, 2258–59, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 601–03, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975); *United States v. Shavers*, 524 F.2d 1094, 1096 (8th Cir.1975).

Statements made by Patrick were a direct result of the coercive arrest and were, therefore, as a matter of law, not a product of free will. Patrick was subject to both physical and psychological inducements. He was physically coerced by virtue of the shackle around his wrist and psychologically prodded by the customs agents who represented that his proferring incriminating information would be to his benefit. As in *Brown*, there was, as a matter of law, no intervening act of defendant's free will breaking the chain of events between the arrest and the confession.

## CONCLUSION

Patrick's confession was the result of an illegal coercive arrest. Statements he made as a result of that arrest were correctly suppressed. The decision of the district court should be affirmed. I respectfully dissent.